## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROBERT E. MARTIN, JR.,       :
                               :
          Plaintiff,       :
                               :
v.                              :     Civil No. 3:02cv1395 (MRK)
                               :
TOWN OF WESTPORT AND     :
STEPHEN EDWARDS,        :
                               :
          Defendants     :

## **MEMORANDUM OF DECISION**

Plaintiff Robert E. Martin, Jr. filed this action on August 12, 2002 against the Town of

Westport and Stephen Edwards (collectively "the Defendants") alleging claims arising under

Title VII of the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983, the Americans with Disabilities

Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, as well as state statutory and common law.  Pending

before the Court is Defendants' Motion for Summary Judgment [doc. #18].  For the reasons set

forth below, the Motion for Summary Judgment [doc. #18] is GRANTED IN PART and

DENIED IN PART.

## I.

The relevant facts are drawn from Defendants' Local Rule 9(c)1 Statement [doc. #19]

("Defs.' 9(c)1 Statement"),[1] and other pleadings and documents submitted by the parties,[2] and

---

[1]Mr. Martin's Local Rule 9(c)2 Statement [doc. #29] is not in compliance with Local
Rule 56(a)(3), which amended Local Rule 9(c)2, effective August 1, 2003.  With respect to each
of the Defendants' assertions of undisputed facts in their Local Rule 56(a)(1) statement, Mr.
Martin simply responds with either "Admitted" or "Denied."  Local Rule 56(a)(2) requires that
"[e]ach denial . . . in an opponent's Local Rule 56(a)(2) Statement, must be followed by a specific

unless otherwise indicated, are undisputed.  Mr. Martin is an African-American male currently

employed by the Town of Westport (the "Town") in its Equipment Maintenance Division.  *Id.* ¶1.

That division falls under the aegis of the Town's Public Works Department, of which Mr.

Edwards is the Director.  *Id.* ¶ 2.  Mr. Martin is, and at all relevant times was, the Master

Mechanic, which is the lead mechanic in the Equipment Maintenance Division, and is

responsible for, among other things, leading, instructing, and assisting all Equipment Mechanics

in all phases of the work, assigning work, writing up job tickets, maintaining records,

---

citation to (1) the affidavits of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)(3).  Since, "all material facts set forth in [the movant's Rule 56(a)(1) Statement] will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)(2)," D. Conn. L. Civ. R. 56(a)(1), the Defendants' factual assertions in their Rule 56(a)(1) will be deemed admitted for the purposes of this motion.  *See S.E.C. v. Global Telecom Servs., L.L.C.*, No. 3:03 CV 418 (PCD), 2004 WL 1638045, at *7 (D. Conn. July 19, 2004).  "Absent such a rule, the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties."  *Id.*  In fact, "Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."  *Id.*

That said, the Court is well aware that the Second Circuit has expressly cautioned that "[i]t is incumbent upon a court in a discrimination case to examine 'the entire record to determine whether the plaintiff could  satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)) (citation omitted); *see Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 382 (2d Cir. 2001) (noting that in evaluating the merits of a Title VII case, the task is "to examine the entire record and, in accordance with *Reeves*, make the case-specific assessment as to whether a finding of discrimination may reasonably be made").  Therefore, the Court will not rely exclusively on Defendants' Rule 9(c)1 Statement in considering Defendants' motion.  In particular, the Court has considered Mr. Martin's Affidavit and the exhibits to his affidavit.

[2] These documents consist of: Defendants' Memorandum of Law in Support of Motion for Summary Judgment [doc. #20] ("Mem. in Supp. of Mot. for Summ. J."); Plaintiff's Memorandum of Law in Support of His Objection to Defendants' Motion for Summary Judgment [doc. #28] ("Mem. in Opp'n. to Mot. for Summ. J."); Plaintiff's Local Rule 9(c)(2) Statement [doc. #29]; and Affidavit of Robert E. Martin, Jr. [doc. #30] ("Martin Affidavit").

maintaining work schedules, and assisting in the requisitioning of parts and supplies. *Id.* ¶ 4; Master Mechanic Description [doc. # 20], Ex. B.

On or about December 20, 1999, Mr. Martin injured his right shoulder and wrist while working for the Town. *Id.* ¶ 10; Martin Affidavit ¶ 18. He underwent surgery on his elbow and wrist on February 14, 2000, and spent time out of work recuperating until about August 2000. *Id.* ¶¶ 11, 12. In August 2000, Mr. Martin returned to work but his treating physician, Dr. Stewart C. Gross, limited Mr. Martin to light duty, not to exceed four hours a day, with no lifting. *Id.* ¶ 13. As a consequence, Mr. Edwards assigned Mr. Martin exclusively to light duty work, including completing paperwork that had accumulated during Mr. Martin's medical absence, and ordering parts and attending to inventory. *Id.* ¶ 14.

On December 14, 2000, Mr. Martin re-injured his right arm while at home clearing snow from his vehicle, and he remained out of work until February 20, 2001. *Id.* ¶ 16. On February 20, 2001, Mr. Martin again returned to light duty for four hours a day, but increased to eight-hour days of light duty beginning February 22, 2001. *Id.* ¶ 17. Mr. Martin's light duty assignment restricted any required lifting to less than ten pounds. *Id.* ¶ 18. On April 13, 2001, after meeting with Mr. Martin and his union representatives, Mr. Edwards advised Mr. Martin by letter that: "as of the end of April we will only have work for you if your doctor authorizes your return to your regular position as Master Mechanic, full time without restrictions, and you do, in fact, return to work." *Id.* ¶19; *see also* April 13, 2001 Edwards Letter [doc. # 20], Ex. F.

As of May 1, 2001, Mr. Martin had failed to provide the Town with a note from his doctor permitting him to return to full-time work without restrictions as required by the April 13 letter. *Id.* ¶ 20. When Mr. Martin reported to work on May 1, he was forbidden from working

and was ordered to turn in his keys. *Id.* ¶ 22; May 1, 2001 Edwards Letter [doc. #30], Ex. 5. However, Mr. Martin continued to receive health benefits and all other benefits in accordance with the contract between the union and the Town. *Id.* ¶ 23. He eventually returned to work and was restored to the payroll on or about October 15, 2001, after an independent medical examiner declared him fit to resume his job. Martin Depo. at 82-83, 85.

Mr. Martin filed a grievance charging wrongful termination and discrimination against the Town and Mr. Edwards under the terms of the Collective Bargaining Agreement ("CBA"). *Id.* ¶ 43. The grievance was filed directly with the First Selectman, who rejected Mr. Martin's contention that he had been terminated by Mr. Edwards since Mr Edwards lacked the authority to fire Mr. Martin. *Id.* ¶ 45; Martin Depo. at 100. The Connecticut State Board of Mediation and Arbitration later affirmed the First Selectman's decision and ruled in the Town's favor, finding that Mr. Martin's employment had not been terminated. *Id.* ¶ 46. On or about May 1, 2001, Mr. Martin filed a complaint with the CHRO alleging that he had been terminated and harassed on the basis of his race and physical disability. *See* CHRO Application, attached to Complaint [doc. #1]. He received a release of jurisdiction on May 20, 2002, *see* CHRO Letter, attached to Complaint [doc. #1], and filed this lawsuit on August 12, 2002.

## II.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact exists when "a reasonable jury could

4

return a verdict for the nonmoving party," and facts are material to the outcome if the substantive

law renders them so. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The moving party

bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party

opposing summary judgment "may not rest upon mere allegations or denials," rather, the

opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.

R. Civ. P. 56(e). The Court must draw all ambiguities and inferences in favor of the plaintiffs.

*See Anderson*, 477 U.S. at 255. However, to defeat a motion for summary judgment, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson*, 477 U.S. at 249-50.

Courts must be "particularly cautious about granting summary judgment to an employer

in a discrimination case when the employer's intent is in question. Because direct evidence of an

employer's discriminatory intent will rarely be found, 'affidavits and depositions must be

carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"

*Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted) (quoting *Gallo v.*

*Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "[s]ummary

judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d

33, 41 (2d Cir. 2000), where a plaintiff's argument is "based on conclusory allegations of

discrimination and the employer provides a legitimate rationale for its conduct." *Tojzan v. N.Y.*

*Presbyterian Hosp.*, No. 00 Civ. 6105, 2003 WL 1738993, at *4 (S.D.N.Y. March 31, 2003).

### III.  Title VII Claims

There are two issues that the Court should address at the outset of its consideration of Mr. Martin's Title VII claims.  First, Mr. Edwards asserts that he is not subject to suit under Title VII, since that law applies to employers and not to individuals, such as Mr. Edwards.  Mem. in Supp. of Summ. J. at 8.  The Court agrees.

Title VII provides, among other things, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."  42 U.S.C. § 2000e(b).  The Second Circuit has held that "under Title VII individual supervisors are not subject to liability."  *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (*per curiam*).

Mr. Martin does not address this issue in his opposition brief, and the Court construes Mr. Martin's failure to respond to Mr. Edwards' argument as a concession that Mr. Edwards is not subject to liability under Title VII.  The Court therefore grants Mr. Edwards summary judgment on all of Mr. Martin's Title VII claims, and in the remainder of this opinion, the Court will address Mr. Martin's Title VII claims only with respect to the Town.

Second, Defendants argue that Mr. Martin has not asserted a viable Title VII claim for gender discrimination.  Mem. in Supp. of Mot. for Summ. J. at 21.  Once again, the Court agrees

6

with Defendants.

Mr. Martin alleges in his Complaint that "[t]he defendants through its agents and employees discriminated against the plaintiff because of plaintiff's race, color, and gender." Compl. ¶ 37. As Defendants observe, Mr. Martin has submitted not a scintilla of evidence in support of his gender discrimination claim. Mem. in Supp. of Mot. for Summ. J. at 21. Mere assertions or conclusory allegations are insufficient to withstand summary judgment. *See Cameron v. Cmty. Aid for Retarded Children*, 335 F.3d 60, 63 (2d Cir. 2003) ("[P]urely conclusory allegations of discrimination, absent any concrete particulars, are insufficient" to establish a genuine issue of material fact.) (citation omitted); *see also Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.") (citation omitted). Moreover, Mr. Martin did not address Defendants' arguments regarding his gender discrimination claim in his brief in opposition to the motion for summary judgment. The Court concludes that Mr. Martin has effectively abandoned any gender discrimination claim he might have had. Accordingly, the Court grants the Town summary judgment on Mr. Martin's gender discrimination claim.

### A.    Disparate Treatment

Mr. Martin's disparate treatment racial discrimination claim against the Town is governed by the well-established three-part *McDonnell Douglas* burden-shifting framework. "'In an employment discrimination case, a plaintiff has the burden at the outset to prove by the preponderance of the evidence a *prima facie* case of discrimination.'" *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (quoting *Collins v. New York City Transit*

*Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). To satisfy his *prima facie* burden, Mr. Martin must demonstrate that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination. *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000).

The Court is satisfied that Mr. Martin has carried his *prima facie* burden in support of his disparate treatment claim. Mr. Martin is a member of a protected class, and he suffered an adverse employment action on May 1, 2001 when he was forbidden to work, was ordered to turn in his keys, and was removed from the payroll from roughly May 1, 2001 to October 15, 2001. Martin Affidavit ¶ 54. While the Town may dispute whether Mr. Martin was competent to perform the duties of his job satisfactorily, Mr. Martin states in his affidavit that he was forbidden to return to work even though he was performing the same duties in his job as he normally did. Martin Affidavit ¶ 50. Moreover, Mr. Martin maintains that, since he was capable of performing the essential duties of his job, racial discrimination is a permissible inference sufficient to satisfy his *prima facie* burden. Mem. in Opp'n to Mot. for Summ. J., at 16. Given that a plaintiff's initial burden in a disparate treatment case is *de minimis*, the Court concludes that Mr. Martin has satisfied the first step in the *McDonnell Douglas* inquiry and that the Court must proceed to the next steps. *See Williams*, 368 F.3d at 126 (citation omitted).[3]

---

[3] Mr. Martin mentions in his affidavit that he was deprived of training opportunities that would improve his chances for promotion to superintendent that were available to his colleagues. Martin Affidavit [doc. #30] ¶ 32. Since the Complaint fails to assert a failure to promote claim, the Court will consider Mr. Martin's claim that he was deprived of training opportunities within the context of his hostile work environment claim.

Once a plaintiff sets forth a *prima facie* claim of discrimination, "a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action." *Mario*, 313 F.3d at 767. The Town has satisfied its obligation to proffer a legitimate non-discriminatory reason for Mr. Edwards' actions forbidding Mr. Martin to return to work on May 1, 2001. The Town points out that the description of Mr. Martin's job as Master Mechanic required him to perform all of the duties of an Equipment Mechanic, *see* Master Mechanic Description [doc. # 20], Ex. B, and that the job description for the Equipment Mechanic requires "Equipment Mechanics [to] maintain and repair various types of construction and maintenance equipment, such as dump trucks, snow plows, sanders, rubber tire loaders, bulldozers, crane, graders, rollers, pumps, pick-up trucks and other miscellaneous equipment" and to be "[p]hysically capable of performing the job requirements." *See* Equipment Mechanic Description [doc. #20], Ex. B. The Town relies upon a May 31, 2001 letter from Mr. Martin's physician, Dr. Gross, which states that Mr. Martin was not capable of performing the tasks associated with the Equipment Mechanic. The letter states, in pertinent part:

> [I] have had the opportunity to review the job descriptions for both the Master and Equipment Mechanic positions in the department of public works . . . As you know, I have been the treating physician for this patient since January 7, 2000. I am well versed in his clinical condition. In my opinion and the best of my medical knowledge, I do not believe that this patient would be able to perform the manual and stressful activities required as the Equipment Mechanic. As a Master Mechanic, he could perform the supervisory functions, but would not be able also to perform the functions of the Equipment Mechanic. His limitations would relate to the inability to perform repetitive, stressful manual labor especially over a prolonged periods of time with relationship to rebuilding and repairing engines.

*See* May 31, 2001 Letter [doc. #20], Ex. F.

In addition, Mr. Martin does not dispute that as of April 30, 2001, he was performing light duty eight hours a day, Martin Depo. at 67, and he acknowledges that on May 1, 2001 he did not have a release from his treating physician allowing him to return to work at full capacity. Martin Depo. at 78.

The Town having proffered a legitimate, nondiscriminatory reason for its actions against Mr. Martin, "the presumption of discrimination created by the *prima facie* case drops out of the analysis, and [the Town] 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" *Mario*, 313 F.3d at 767 (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir .2000)). The burden thus shifts back to the plaintiff to prove "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id*. (quoting *Reeves*, 530 U.S. at 143). The Court must not rely solely on the plaintiff's rebuttal of the employer's explanation but must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Id*. (quoting *Reeves*, 530 U.S. at 143).

Upon its review of the entire record in this case, the Court concludes that while Mr. Martin's case is thin, there are questions of material fact surrounding the Town's motivations in its adverse action against Mr. Martin on May 1, 2001 that require this Court to submit Mr. Martin's claims to the jury for resolution.

It is undisputed that Mr. Martin received a letter dated April 13, 2001 which stated:

> As we discussed this morning the Town of Westport does not have permanent light work duty assignments available and as of the end of April 2001 your light duty work assignment will end. Therefore, as of the end of April we will only

have work for you if your doctor authorizes your return to your regular position as
Master Mechanic, full time without restrictions, and you do, in fact, return to
work.

*See* April 13, 2001 Edwards Letter [doc. # 20], Ex. F. In addition, as stated earlier, Dr. Gross

opined that Mr. Martin was not qualified to perform the full spectrum of duties outlined in

description of his position as Master Mechanic on May 1, 2001.

However, Mr. Martin asserts in his affidavit that "[a]t the time my employment was

terminated on May 1, 2001, I was doing the same duties in my job as I normally did while not

under any medical care," and that he was "able to perform my duties as Master Mechanic and

Equipment Mechanic on May 1, 2001, with any doctor's limitation(s) or disability that I had."

Martin Affidavit ¶¶ 50, 52. Mr. Martin also contests the Town's claim that the lifting restrictions

prevented him from fulfilling his regular duties, since, "[h]istorically, as a Master Mechanic, I

did not need to lift more than three pounds," and, in any case, "[n]o poundage is found in any job

description." Martin Affidavit ¶¶ 56, 57. Furthermore, Mr. Martin challenges the information

upon which Dr. Gross based his medical assessment of his working capacity. Mr. Martin claims

that "according to my job and what I do [], it was nothing compared to what [Defendants] told

him." Martin Depo. at 84. In short, Mr. Martin insists that Mr. Edwards' asserted justification

for his action was pretextual – that is, that regardless of what the job description may say, as of

May 1 he was doing all of the duties that he normally performed as a Master Mechanic and could

have continued to do so had Mr. Edwards not forbidden him from working. Only a jury can

resolve that factual dispute.

Of course, merely demonstrating that Mr. Edwards' asserted justification was pretextual

does not necessarily satisfy Mr. Martin's obligations under *McDonnell Douglas*; he also must

11

proffer evidence from which the trier of fact could reasonably conclude that the real reason for

Mr. Edwards' action was racial discrimination.  To that end, Mr. Martin proffers evidence of

alleged differential and more favorable treatment accorded to white employees who were injured

on the job or were otherwise disabled.  "[W]here a plaintiff seeks to establish the minimal *prima*

*facie* case by making reference to the disparate treatment of other employees, those employees

must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that

the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*,

263 F.3d 49, 54 (2d Cir. 2001).  "To be 'similarly situated,' the individuals with whom [the

plaintiff] attempts to compare [himself] must be similarly situated in all material respects."

*Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

Mr. Martin provides several examples of white employees who were allegedly treated

more favorably than he after they were injured.  In the main, Defendants do not contest that these

other employees were injured or that they were accommodated for a period of time.  The parties

do dispute, however, whether Mr. Martin was similarly situated to the white employees, as

required to allege disparate treatment on the basis of race.  For instance, Mr. Martin points to

John Gudzick, Martin Depo. at 103-04, who while working in the highway division, injured his

right eye in 1983 and was left slightly impaired.  Def.'s 9(c)1 Statement ¶ 29.  Mr. Martin bases

his assertion that Mr. Gudzick was treated preferentially for his injury on two workplace

accommodations: first, Mr. Gudzick was permitted to rely on others to read a transom and,

second, Mr. Gudzick was allowed to drive a smaller truck than other workers.  Martin Depo. at

108-09.  Defendants, however, argue that when Mr. Gudzick was able to return to work, he did

do without restrictions.  Defs.' 9(c)1 Statement ¶ 29.

Next, Mr. Martin points to Michael Frawley, Martin Depo. at 104-05, the Building Maintenance Mechanic. Defs.' 9(c)1 Statement ¶ 30. In September 1994, while working as a building maintenance mechanic, Mr. Frawley broke his ankle in an injury unrelated to work. *Id.* He was out of work for several weeks, then released for a light duty assignment on around October 6, 1994. *Id.* One month later, on November 10, 1994, Defendants state that Mr. Frawley returned to unrestricted work. *Id.* Mr. Martin asserts that Mr. Frawley's injury was accommodated for approximately three or four months. Martin Depo. at 107. Mr. Martin also claims that Dougie Meyers received better treatment following an injury that affected his ability to work. Martin Depo. at 132. Defendants acknowledge that Mr. Meyers is a building maintenance mechanic, Def.'s 9(c)1 Statement ¶ 33, and is restricted to lifting 40 pounds as a result of a back injury. *Id.* He has been accommodated for ten months on a light duty assignment covering for a sick custodian. *Id*.

The parties' disputes over whether Mr. Martin was or was not similarly situated to the white employees and whether Mr. Martin was or was not was accorded less favorable treatment than the white employees involve factual disputes that are properly the province of the jury. *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) ("[a]s a general rule, whether [individuals] are similarly situated is a factual issue that should be submitted to the jury"); *see Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (reversing district court's grant of summary judgment, the court emphasized that "[w]hether [] employees are similarly situated ordinarily presents a question of fact for the jury.").[4] Consequently, the Court denies the

---

[4] The Second Circuit in *Harlen Assocs.*, however, noted that "[t]his rule is not absolute, [], and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs.*, 273 F.3d at 499 n.2 (citing *Cruz v.*

Town's motion for summary judgment on Mr. Martin's Title VII disparate treatment claim.

### B.    Retaliation

Title VII prohibits employers from discriminating against an employee "because [such employee] has opposed any practice made an unlawful employment practice by this subchapter . . ." 42 U.S.C. § 2000e-3(a). "Title VII is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003) (citation and quotation marks omitted). The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims brought pursuant to Title VII. *Id*. at 141. "To establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Id*. If the defendant introduces such evidence, the plaintiff bears the burden of proving that the alleged justification is merely a pretext for discriminatory motive. *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996).

In his opposition brief, Mr. Martin notes that he filed two separate CHRO complaints, one in 1997 and the other on May 1, 2001. Mem. in Opp'n to Mot. for Summ. J., at 26. However, he further states that "[t]he CHRO complaint filed on May 1, 2001 is the basis for this lawsuit." *Id.* Therefore, his 1997 complaint is irrelevant for purposes of this lawsuit. With regard to the May 1, 2001 CHRO complaint, Mr. Martin relies wholly on proximity, stating that "the plaintiff's filing of the CHRO complaint and the adverse employment action on May 1, 2001

_____

*Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000)). However, on the basis of the record submitted, the Court cannot conclude that no reasonable juror could find the similarly situated prong met.

was very close." Mem. in Opp'n to Mot. for Summ. J. at 26.  While Mr. Martin contends that on

May 1, 2001, the Town took adverse employment action against Mr. Martin in retaliation for his

CHRO complaint, as the Town points out, Mr. Martin filed his complaint with the CHRO *after*

he was told to leave the premises and turn in his keys, the events that give rise to Mr. Martin's

allegations of disparate treatment racial discrimination.  Def.'s Reply Mem. at 7-8.  The sequence

of events, as chronicled by Mr. Martin himself, thus precludes the Court, or any reasonable trier

of fact, from finding that the Town took the adverse action against him on May 1 in response or

in retaliation to his *subsequent* filing of a CHRO complaint.[5]  Because Mr. Martin cannot

establish the first prong of his *prima facie* burden on a retaliation claim, the Town is entitled to

judgment as a matter of law on that claim.

### C.    Hostile Work Environment

Lastly, Mr. Martin alleges that he was subjected to a hostile work environment in

violation of Title VII.  "In order to prevail on a hostile work environment claim, a plaintiff must

first show that the harassment was sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment."  *Feingold v. New York*, 366

F.3d 138, 149 (2d Cir. 2004).  "Second, the plaintiff must demonstrate a specific basis for

imputing the conduct creating the hostile work environment to the employer."  *Id*. at 150.

"Proving the existence of a hostile work environment involves showing both objective

and subjective elements: the misconduct shown must be severe or pervasive enough to create an

objectively hostile or abusive work environment, and the victim must also subjectively perceive

---

[5] In addition, Mr. Martin was forewarned in an April 13, 2001 letter – well in advance of
Mr. Martin's CHRO complaint – of the adverse action he eventually experienced on May 1.
April 13, 2001 Edwards Letter [doc. # 20], Ex. F.

that environment to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993)). "In determining whether an actionable hostile work environment claim exists, [the

court] look[s] to all the circumstances, including the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger*

*Corp. v. Morgan,* 536 U.S. 101, 116 (2002); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523

U.S. 75, 78 (1998) (stating that a hostile work environment is created "[w]hen the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment").

      Viewing the totality of the circumstances in the light most favorable to Mr. Martin, and

drawing all inferences in his favor, the Court concludes that no reasonable jury could find that

Mr. Martin's work environment was objectively hostile or abusive. "A hostile work environment

claim is composed of a series of separate acts that collectively constitute one unlawful

employment practice." 42 U.S.C. § 2000e-5(e)(1); *Morgan*. 536 U.S. at 117. "As a general rule,

incidents must be more than episodic; they must be sufficiently continuous and concerted in

order to be deemed pervasive. " *Id.* Mr. Martin has provided sparse and largely conclusory

allegations of harassing incidents. One such incident involved a co-worker, Joe Izzo, who

allegedly called Mr. Martin a "coon." Martin Depo. at 127. A second incident involved another

co-worker, Dale Wehmhoff, who allegedly used the "N" word in referring to Mr. Martin. *Id.* at

128. However, Mr. Martin denies that the incident involving Mr. Wehmhoff is part of this

litigation, and therefore the Court will not consider it for purposes of this motion.  *Id.*[6]

Moreover, Mr. Martin was unable to describe any other instances of racially hostile conduct at

work, *id.* at 130, and he admitted that he was unaware of any supervisors using racially

insensitive language.  *Id.* at 133.  As a consequence, the only incidents that form the basis of Mr.

Martin's hostile work environment claim, are the Mr. Izzo remark and Mr. Edwards' actions in

barring him from work on May  1, 2001.

  While not in any way intending to condone Mr. Izzo's remark – which was inappropriate

and should not be tolerated in any workplace – the Court does not believe that a reasonable jury

could find that this lone comment, for which Mr. Izzo apologized to Mr. Martin shortly after

uttering it, Martin Depo. at 127, transformed Mr. Martin's workplace into one that was

objectively hostile and permeated with racial animus.  *Oncale*,  523 U.S. at 78.  The Second

Circuit has noted that "in order '[f]or racist comments, slurs, and jokes to constitute a hostile

work environment, there must be more than a few isolated incidents of racial enmity.'"

*Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (quoting

*Schwapp*, 118 F.3d at 110).  That is a standard that Mr. Martin has not met.[7]

---

[6] There are oblique references in Mr. Martin's deposition to prior litigation that apparently resulted in a jury verdict.  Martin Depo. at 128.  It appears that Mr. Martin at his deposition was only willing to answer questions regarding his work environment that involved the time period after the trial in his previous lawsuit.  *Id.* 128-29.

[7] Mr. Martin is also unable to demonstrate "a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold*, 366 F.3d at 150.  The Town has a policy against discrimination that provides a complaint procedure for employees.  Defs.' 9(c)1 Statement ¶ 50.  With regard to Mr. Izzo's remark, although Mr. Martin was aware of the Town's anti-discrimination policy, he did not report Mr. Izzo's comment pursuant to that policy. *Id.* ¶¶ 52, 53.  It would be illogical to impute to the Town  knowledge of Mr. Izzo's stray remark when Mr. Martin never reported it to the Town.  *See Faragher v. City of Boda Raton*, 524 U.S. 775, 806-07 (1998) ("If the plaintiff unreasonably failed to avail herself of the employer's

As to the adverse employment action suffered by Mr. Martin on May 1, 2001, even if Mr. Martin subjectively perceived the action to be motivated by hostility towards his race, the Court is unable to conclude that a reasonable trier of fact could find that this incident made his work environment objectively hostile within the meaning of the relevant case law. *See Pennsylvania State Police v. Suders*, __ U.S. __, 124 S. Ct. 2342, 2345 (2004). While the Second Circuit has commented that "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace," *Feingold*, 366 F.3d 150, Mr. Martin has not described any incident or act that worked such a transformation of Mr. Martin's workplace. Finally, Mr. Martin's allegation that the Town failed to provide Mr. Martin training opportunities on par with white employees does not by itself or in conjunction with the other allegations adequately support a hostile work environment claim.

Since Mr. Martin has not shown that there are genuine issues of material facts with regard to his hostile work environment claim, and the Court finds that the undisputed facts are insufficient as a matter of law to establish an objectively abusive environment, the Court grants the Town summary judgment on Mr. Martin's hostile work environment claim. In sum, the Town in entitled to summary judgment on all of Mr. Martin's Title VII claims except for his disparate treatment claim relating to his being barred from work on May 1, 2001.

---

preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so."). Mr. Martin does not contend that Mr. Izzo was his supervisor, or that any supervisor harassed Mr. Martin. Therefore, the Town cannot be held vicariously liable for Mr. Izzo's remark. *See id.* at 807 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").

## IV. ADA Claims

Mr. Martin brings two claims pursuant to the ADA, one for the adverse employment action he suffered on May 1, 2001, Compl. ¶ 48, and the other for an alleged failure to accommodate Mr. Martin's alleged disability. *Id.* ¶ 51. As with Title VII, Mr. Edwards is not subject to liability under the ADA. The ADA's prohibition against discrimination applies only to employers, employment agencies, labor organizations, and labor-management committees. 42 U.S.C. § 12111(2). It does not contemplate individual liability. *See Diggs v. Town of Manchester*, 303 F. Supp. 2d 163, 175 (D. Conn. 2004) (noting that ADA does not provide for individual liability). Since the definition of "employer" in Title VII and the ADA are identical, Mr. Edwards is not subject to liability under the ADA. *See Hiller v. Brown*, 177 F.3d 542, 545 n.5 (6th Cir. 1999) ("The ADA, ADEA, and the Rehabilitation Act borrowed the definition of "employer" from Title VII."); *Cerrato v. Durham*, 941 F. Supp. 388, 395 (S.D.N.Y. 1996) ("As other courts have recognized, the arguments against individual liability apply with equal force to the mirror-image statutory provisions of Title VII and the ADA."); *Harrison v. Indosuez*, 6 F. Supp. 2d 224, 229 (S.D.N.Y. 1998) ("[A]s Title VII and the ADA define 'employer' identically, the Court's holding in *Tomka* clearly supports the rejection of personal liability under the ADA as well."). Accordingly, the Court grants Mr. Edwards summary judgment on all of Mr. Martin's ADA claims. *See Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003).

To make out a *prima facie* ADA case against the Town, Mr. Martin must show that (1) the Town is subject to the ADA; (2) he was a person with a disability within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of

his disability. *Id.* at 99. The Town does not contest the first element, and the Court has already determined that Mr. Martin suffered an adverse employment action. The Town directs its arguments to the second and third elements of Mr. Martin's *prima facie* burden. Mem. in Supp. of Mot. for Summ. J. at 21-27.

The second element requires Mr. Martin to show that he was disabled within the meaning of the ADA. The ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The only disability asserted by Mr. Martin in his pleadings is a physical impairment that substantially limits one or more major life activities.

As the Supreme Court has emphasized, "[m]erely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 195 (2002); *see* 42 U.S.C. § 12102(2)(A). "'Major life activities' . . . refers to those activities that are of central importance to daily life. In order for performing manual tasks to fit into this category – a category that includes such basic abilities as walking, seeing, and hearing – the manual tasks in question must be central to daily life." *Toyota*, 534 U.S. at 197. When asked whether there was anything he could not do with his injured arm that was significant, Mr. Martin replied, "I will never bowl again." Martin Depo. at 49. On the other hand, Mr. Martin conceded that he could write with his left hand, *id.* at 50; eat; *id.* at 50; torque a wrench, *id.* at 51; walk, *id.* at 73; speak, breath, see, hear, and care for himself. *Id.* at 74. As is apparent from his own testimony, Mr. Martin was not limited in his ability to perform manual tasks. *See Toyota*, 534 U.S. at 198. Nor

could Mr. Martin identify any other activities that are of central importance to daily life that were precluded or limited by his injury.  Furthermore, Mr. Martin admitted that his impairment at all relevant times was only temporary.  *See id.* (stating that the impairment's impact must be permanent or long term in order to be substantially limiting).

For purposes of the ADA, a worker could be substantially impaired from the major life activity of working.  *See, e.g., Cameron v. Cmty. Aid For Retarded Children*, 335 F.3d 60, 64-65 (2d Cir. 2003); *Bartlett v. New York State Bd. of Law Exam'rs*, 226 F.3d 69, 83 (2d Cir. 2000). However, as the Supreme Court has pointed out, "[t]o be substantially limited in the major life activity of working, [] one must be precluded from more than one type of job, a specialized job, or a particular job of choice."  *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999); *see Giordano v. City of New York*, 274 F.3d 740, 747-48 (2d Cir. 2001) (same); *see also* 29 C.F.R. § 1630.2(j)(3) ("The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.").  "To make out this claim, a plaintiff must establish that she was regarded as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs.'"  *Cameron*, 335 F.3d at 64-65.  Only a single, specific job, that of Master Mechanic, is at issue in this case, and Mr. Martin does not claim, let alone provide any evidence that would allow a trier of fact to conclude, that his impairment excluded him from a class of jobs or a broad range of jobs.  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*; *see Sutton*, 527 U.S. at 491-92.  On the basis of the undisputed facts, therefore, the Court finds that no reasonable trier of fact could conclude that Mr. Martin was disabled within the

meaning of the ADA.  Consequently, the Court grants the Town summary judgment on Mr.

Martin's ADA claims for disability discrimination and failure to accommodate.

## VI.  Due Process

"In analyzing plaintiffs' procedural due process claims, the court must first determine (1)

whether plaintiffs possessed a protected liberty or property interest, and, if so, (2) what process

plaintiffs were due before they could be deprived of that interest."  *Sealed v. Sealed*, 332 F.3d 51,

55 (2d Cir. 2003).[8]

Even assuming that Mr. Martin had a property interest in his job, the Court does not

believe that, based on the undisputed facts of this case, a reasonable juror could conclude that

Mr. Martin was denied an adequate opportunity to be heard.  The CBA sets forth a grievance

procedure for employees who wish to appeal disciplinary actions.[9]  Mr. Martin was aware of the

---

[8] The Complaint does not set forth a § 1983 substantive due process claim stemming from alleged racial discrimination.  Mr. Martin makes reference to a due process violation under the Second Count for violation of the ADA, Compl. ¶ 58, but the Court has dismissed Mr. Martin's ADA claim.  Mr. Martin also raised a substantive due process claim based on racial discrimination for the first time in an opposition brief, *see* Mem. in Opp'n to Mot. for Summ. J., at 24-25, but any such claim is untimely and, therefore, the Court will not consider it

[9] Article X of the Collective Bargaining Agreement Between The Town of Westport and Council #4, AFSCME, AFL-CIO, Local 1303-385, July 1, 1999 to June 30, 2004 [doc. #20], Ex. G, provides in pertinent part:

SECTION 2. PURPOSE
The purpose of this procedure is to provide an orderly method of adjusting grievances.  A grievance raised by an employee involving the interpretation or application of any provision of this Agreement (including the following areas not specifically covered by this Agreement: transfer, demotion and classification of position) shall be resolved in the following manner:

STEP 1. EMPLOYEE TO SUPERVISOR
The employee . . . shall present to the Supervisor all the facts available pertaining to the

procedures, and filed a grievance on the day he alleges he was terminated.  Martin Depo. at 98.

Mr. Martin's grievance went directly to the First Selectman, who ruled that only she, not Mr.

Edwards, had the authority to fire Mr. Martin, and that she had not done so.  *Id.* at 100.  The First

Selectman, therefore, determined that Mr. Martin had not, in fact, been terminated.  *Id.*  Mr.

Martin subsequently arbitrated his claims, pursuant to the CBA.  *Id.*  The arbitration panel also

found that Mr. Martin had not been terminated.[10]  *Id.* at 102.

---

grievance within fifteen (15) working days of the grievance or when the employee should have had knowledge of the facts giving rise to the grievance.  Within three (3) working days thereafter the Supervisor shall adjust the grievance or notify the employee and or his/her representative of his/her decision.

STEP 2.  <u>TO THE DIRECTOR OF PUBLIC WORKS</u>
If the employee and his/her representative feel there should be further review, the facts pertaining to the grievance shall be presented to the Director of Public Works in writing by the steward within five (5) working days of the date the Superintendent's written notice is given or such notice was due.  The Director of Public Works shall review the grievance and discuss it with the employee and his/her representative within five (5) working days and shall render his/her decision thereafter in writing within give (5) working days following such meeting.

STEP 3.  <u>TO THE FIRST SELECTMAN</u>
If the employee and his/her representative feel further review is necessary, the UNION will request a meeting with the First Selectman within five (50 working days following the written decision of the Director or when such decision was due.  The First Selectman shall, within seven (7) working days call a meeting of all the parties concerned and the Union's Grievance Committee and discuss the grievance fully.  The First Selectman may render a decision in writing, either at the end of the meeting or within seven (7) days after the meeting to the Representative of the UNION.

STEP 4.  <u>ARBITRATION</u>
In the event the UNION feels that further review is justified, then within thirty (30) calendar days following the written decision of the First Selectman or when such decision was due, the UNION shall file notice of appeal to submit the matter to arbitration.  The decision of the Board shall be final and binding on both parties.

[10] The Westport Code, § C4-5, states that "[t]he First Selectman, at his or her discretion, may remove any employee of the Town and any officer or member of any appointed Board or

Mr. Martin argues that "[a]lthough the collective bargaining agreement attempted to provide due process [], it failed in total in that the first step of the grievance procedure was set up in such a fashion that the first select person, the head of one of the parties to the action, Town of Westport was the decision maker.  There is a conflict, thus the grievance procedure is unjust, unfair and provided no due process to the plaintiff."  Mem. in Opp'n to Mot. For Summ. J. at 18-19.  The Court disagrees.  It is well-established in case law that the type of grievance procedure provided Mr. Martin by the CBA is sufficient to satisfy constitutional standards.  For example, in *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206 (2d Cir. 2003), the Second Circuit held as follows:

> The CBA, which governed [plaintiff's] employment, established a grievance and arbitration procedure, and [the plaintiff] took advantage of these procedures by filing two grievances that were considered by the Board and by pursuing arbitration.  Courts have held that such post-deprivation procedures, providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process.  *See e.g., Narumanchi v. Bd. of Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988); *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 102 (1st Cir. 2002) (pre-deprivation notice and "the full arbitration afforded by the collective-bargaining agreement w[ere] more than sufficient to satisfy" due process requirements).

*Harhay* 323 F.3d at 213.

It is apparent from Mr. Martin's brief that he takes issue not with the process he was provided but rather with the result reached by that process.  Mr. Martin's disagreement with the substance of the arbitrators' decision does not in any way support a claim for denial of *procedural* due process.

The Court therefore grants both Defendants summary judgment on Mr. Martin's

---

Commission, except as provided by statute."

procedural due process claim.[11]

## XI.  State Law Claims

In addition to his federal claims, Mr. Martin brings the following claims under Connecticut state law against the Defendants: discrimination pursuant to Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60 *et seq.* ("CFEPA"); intentional infliction of emotional distress; and negligent infliction of emotional distress.

As with Title VII, Mr. Martin cannot bring claims against Mr. Edwards, an individual supervisor, under CFEPA.  *See Perodeau v. City of Hartford*, 259 Conn. 729, 737 (2002).  As a result, Mr. Edwards is granted summary judgment on the CFEPA claim.  As to Mr. Martin's CFEPA claim against the Town, the Connecticut Supreme Court has held that Connecticut anti-discrimination statutes are "coextensive with [Title VII]," *Brittell v. Dep't of Corr.*, 247 Conn. 148, 164 (1998); *see Arnold v. Yale New Haven Hosp.*, 213 F. Supp. 2d 142, 151 (D. Conn. 2002).  For the reasons previously stated, the Court therefore grants the Town summary judgment on Mr. Martin's CFEPA claim to the extent it is based upon claims of retaliation, hostile work environment or gender discrimination.  However, to the extent that Mr. Martin's CFEPA claim is based on disparate treatment racial discrimination relating to the events of May 1, 2001, the Court denies the Town's motion for summary judgment for the same reasons stated above

---

[11] Since the Court has determined that Mr. Martin has not established the threshold element of a qualified immunity analysis – that he was deprived of a clearly established constitutional right, due process or otherwise –  it is unnecessary for the Court to address the Town's qualified immunity argument with respect to Mr. Edwards.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

regarding Mr. Martin's Title VII claim.

Mr. Martin's remaining state law claims against Mr. Edwards and the Town are common law claims for intentional and negligent infliction of emotional distress.  Compl. at 10.  To establish a intentional infliction of emotional distress claim under Connecticut law, a plaintiff must demonstrate four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 442-43 (2003) (citing *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000)).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine."  *Id.* (citing *Bell v. Bd. of Educ.*, 55 Conn. App. 400, 410 (1999).  "Liability for intentional infliction of emotional distress requires conduct that exceeds "'all bounds usually tolerated by decent society . . .'" *Carrol*, 262 Conn. at 443 (quoting *Petyan v. Ellis*, 200 Conn. 243, 254 n. 5)).  "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress."  *Id.* at 443.  "Only where reasonable minds disagree does it become an issue for the jury."  *Appleton*, 254 Conn. at 210.

Mr. Martin alleges that the "conduct of Defendants in connection with the termination of the Plaintiff's employment while under medical care for work-related injury was 'extreme and outrageous'" and that the discriminatory treatment to which he was subjected evinced malice on the part of the Defendants sufficient to be regarded as a "hate crime."  Mem. in Opp'n to Defs.'

26

Mot. for Summ. J. at 29-31.  Mr. Martin's passionate words notwithstanding, the record as a whole fails to demonstrate that Defendants' conduct with respect to Mr. Martin was at any point "atrocious," *Carrol*, 262 Conn. at 444, and the Court does not believe that reasonable minds could disagree with this conclusion.

In order to state a claim for negligent infliction of emotional distress, the plaintiff must allege that he was terminated from his employment.  *Perodeau*, 259 Conn. at 762.  In addition, the plaintiff must demonstrate "'unreasonable conduct of the defendant in the termination process.'"  *Id.* at 750 (quoting *Parsons v. United Tech. Corp.,* 243 Conn. 66, 88 (1997).  It is clear from Mr. Martin's own testimony that he was not terminated.  He admits that the arbitration board that heard Mr. Martin's grievance concluded that Mr. Martin had not been terminated, Martin Depo. at 102, and, as Mr. Martin admits, he returned to work "right away" on or about October 15, 2001, after being cleared by a couple of doctors.  Martin Depo. at 85.  Furthermore, even assuming *arguendo* that Mr. Martin was terminated, wrongful termination is not by itself a sufficient basis upon which to sustain a claim for negligent infliction of emotional distress.  *See Perodeau*, 259 Conn. at 750.  There are no facts in the record from which a reasonable juror could find that Mr. Martin is entitled to recover for either intentional or negligent infliction of emotional distress, and the Court therefore grants Defendants summary judgment on both claims.

## XI.  Conclusion

For the foregoing reasons, the Court GRANTS IN PART Defendants' Motion for Summary Judgment [doc. #18].  The Court grants Defendant Edwards summary judgment on all of Plaintiff's claims, and Mr. Edward's is therefore dismissed from this case.  The Court grants

the Defendant Town of Westport summary judgment on all of Plaintiff's claims except his Title

VII and CFEPA claims for disparate treatment and racial discrimination in the First Count of the

Complaint.  The parties shall submit their joint trial memorandum in accordance with the Court's

instructions on joint trial memoranda no later than **September 20, 2004** and be ready for trial

thereafter.  The parties are directed to contact Chambers to obtain a copy of the Court's Joint

Trial Memo Instructions.

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

Dated at New Haven, Connecticut: <u>August 4, 2004</u>.